BARRY, Judge,
dissenting:
The note plainly states the bank is authorized to apply “... as it sees fit, any and all moneys, stocks, bonds or other property of any kind whatever .... belonging to any party hereto” ... “to the payment and extinguishment ... of any of the obligations or liabilities, direct or contingent, of any of the parties hereto ... up to the amount of $15,000,000.00” (my emphasis). The majority correctly interprets this as clearly establishing a $15 million limit upon Whitney’s right to impute, but falls into error when applying the provision to several payments the bank received following the Whitney trial.
COMPONENTS OF THE $15,000,000 (see appendix)
Whitney’s records (produced under subpoena) show the bank received payments totalling $19,918,693.64 on Farber-related accounts since the note was executed on July 12, 1973.[1] Each collected amount represents an obligation or liability “direct or contingent” of a “party” (Farber) to the subject note. Based on the bank’s records, *1197 payments totalling $17,771,215.61[2] were imputed by Whitney to Farber-connected accounts prior to the close of trial in Whitney; therefore, the bank’s discretion to impute payments had ceased and the partnership note should have been reduced accordingly. However, the majority wrongfully concludes that Whitney “was not obliged to impute payments made subsequent to June 19, 1980,” then goes on to explain why the various amounts should not be credited to the note. I’m satisfied the payments received subsequent to June 19, 1980 should be credited against the note because of the source of these payments.
IMPUTATION OF PAYMENTS (see appendix)
After the $15 million limit was reached, codal articles on imputation of payments (LSA-C.C. Arts. 2168 et seq.) are applicable to funds attributable to the partnership note. Under these provisions payments go to the debt “... which the debtor had at the time the most interest in discharging, of those that are equally due .... If the debts be of a like nature, the imputation is made to the debt which has been longest due ...” LSA-C.C. Art. 2166. Any interest due must be paid either first or concurrently with principal. LSA-C.C. Art. 2164. Certainly the debtor (Farber) had “the most interest in discharging” this debt (secured by a surety)[3] and the record shows it was the “longest due.” Hence, once $15 million was exceeded, this note should be the first debt paid out of money collected by the bank on behalf of the partnership account.
The bank argues this issue was litigated in Whitney and was precluded by an order from this Court. The $15 million cap was not raised in Whitney.[4] These payments were received after the first trial ended and the $15 million had been reached. Therefore, this matter could not have been litigated in Whitney and payments received by the bank were not barred from consideration by our March 5, 1981 order.[5]
Whitney also complains that the rules of imputation can be evoked only by the “debtor of several debts”[6] (Farber) and not the surety. That reasoning is illogical. The debtor and creditor have more freedom to act in their dealings when only their interests are affected rather than when others may be prejudiced by their actions.
After the Whitney trial, the note was placed in a separate account by the bank.[7] There were foreclosures on properties and stocks and other collateral were sold, most of which had at one time been pledged by Farber to secure this particular note.[8] Proceeds from the foreclosures and sales of collateral were intentionally credited by the bank to other debts of Farber and Elk Place at Whitney’s discretion and Farber’s direction. None of the endorsers had notice of the proceedings and did not know how the money was applied by the bank. Whitney and Farber were aware this diversion of funds was to the detriment of the note’s endorsers because Elk Place and Farber were in bankruptcy and would never be able to reimburse the sureties (as provided by law) if they were called upon to pay this note.
Under these circumstances, I believe it is unconscionable to allow Whitney and Far-ber to agree to divert payments to the *1198 prejudice of the five endorsers. The sureties had the right to demand imputation as provided by law and their intent should have been manifest to Whitney and Farber after the Whitney trial. See Duffy v. Roman, 209 So.2d 502 (La.App. 4th Cir.1968), Grand Lodge, Benevolent Knights of America v. Murphy Construction Co., 152 La. 123, 92 So. 757 (1922), R.P. Fransworth & Co. v. Electrical Supply Co., 112 F.2d 150 (5th Cir.), cert. denied, 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454 (1940).
MANDATORY CREDITS AFTER IMPUTATION
The following sums received by Whitney subsequent to the end of the Whitney trial on June 19,1980, should have been credited:
1. $704,386.67 — Received by Whitney on October 29, 1980 from foreclosure sale of Elk Place Medical Plaza. (Exhibit P-20)
2. $4,246.23 — Received by Whitney on November 10, 1980 from Harris Mortgage Corporation for application to the debt of Elk Place Medical Plaza. (Exhibit P-20)
3. $445,059.09 — Received by Whitney from sale of Farber stock on February 5 and 6, 1981. This amount was applied to two loans made by Farber. (Exhibit P-19)[9]
Farber admitted at trial that the stocks which were “sold”[10] had been pledged to secure the Elk Place debt. (Testimony of March 6, 1981, p. 27). Whitney’s only explanation was this amount represented all pledged stock held by the bank registered in the names of Dr. and Mrs. Farber, except Coldwell Mortgage and Fairgrounds stock. The court in O’Quinn found that these stocks (i.e. those “sold”) were pledged to secure the subject note. In light of Far-ber’s testimony and the July 11, 1973 letter (Exhibit P-25) from Farber to Treuting regarding the pledge of stock, I do not find that conclusion erroneous.
Whitney also objects to the inclusion of stock proceeds to extinguish the note based upon Farber’s testimony that he and Whitney agreed this amount would apply to his personal loans (see footnote 9, supra.) As stated above, subsequent to the first trial and the $15 million limit being met, under the circumstances of this case, the debtor and creditor were not at liberty to direct payments to the prejudice of the endorsers.[11] Farber owed several debts to Whitney and the endorsers herein had the right to imputation in order to protect their positions. These stocks were owned by Farber and pledged to secure this note; unquestionably, the proceeds should have been imputed to this note.[12]
The following assets, when liquidated, should also be imputed:
1. Coldwell Mortgage — 36,150 Common Shares
—3,200 Preferred Shares
Fairgrounds — 4,196 Common Shares.
Mr. Hart, Whitney’s vice president, testified these stocks were held by the bank, *1199 belonged to Farber, and were in the process of being sold. Farber testified: “There’s been agreed a private sale of these stocks which is waiting on a clarification from Judge Bernard of the bankruptcy court.” O’Quinn argues these stocks were pledged to secure the note, citing the July 11, 1973 letter. The stocks were not specifically listed in that letter, but Farber stated he estimated 40% of these stocks were pledged to secure Elk Place (testimony March 6, 1981, p. 29). The evidence is sufficient to require imputation.
2. Funds held by bankruptcy court.
Richard Leefe, attorney representing Elk Place, Harvey Oil Center, and Farber in three bankruptcy proceedings, testified that “approximately two hundred thousand dollars” was available in the Elk Place bankruptcy and Whitney was the largest unsecured creditor. If Whitney receives money from the bankruptcy court on the Elk Place account it should be imputed to the note.
3. $10,000 — Certificate of Deposit due March 26,1981.
At the time of trial (March 5, 1981) the certificate had not matured, but testimony does not confirm that the C.D. was in the name of Elk Place. Whitney’s Mr. Hart was the only person to testify regarding this item when referring to securities pledged by Farber to Whitney. Whitney’s brief states the C.D. was actually issued in the name of and pledged by Farber. O’Quinn argues it is irrelevant whether issued in Farber’s or Elk Place’s name as it was clearly available as a credit. If issued in either name, when the money was (or is) received it should be credited to this note.
ITEMS NOT SUBJECT TO IMPUTATION
The O’Quinn court erred by including the following amounts for credit to the Elk Place account:
1. $109,000.00 — Sale of West Bank Petroleum Club note purchased by Whitney at public sale.
Mr. Hart was the only person to testify regarding this transaction and stated the note was from a tenant of the Harvey Oil Center and pledged by Dr. Farber and Mr. Leefe as security to any of their obligations. This was not refuted by O’Quinn. The amount was credited by Whitney to the Harvey Oil Center account on February 4, 1981. O’Quinn argues it should be a credit because the note was part of the properties cross-collateralized on the cross-pledge of September 24, 1978. However, Mr. Leefe had no association with Elk Place and the evidence is insufficient to allow a credit.
2. $32,240.00 — Payments in excess of the note’s 8½% interest.
This issue was litigated in the Whitney suit. Elk Place, the maker, acquiesced in higher interest rates and that money cannot be recouped by the endorsers.
SUMMARY
The following amounts should be imputed for credit on the partnership note as of the specified dates:
$ 704,386.67 - as of October 28,1980
4,246.23 - as of November 10,1980
441,359.95 - as of February 5,1981
3.699.14 - as of February 6,1981
81.153.691.99
In addition, the unliquidated assets (Cold-well and Fairgrounds stock, bankruptcy funds, and C.D.) should be credited whenever received by Whitney.
The Whitney Bank, assisted by Farber, was in the driver’s seat throughout this scenario. The endorsers were at the mercy of the bank and its imputation clause (agreeably and legally) up to the bank’s self-imposed limitations in the clause. Thereafter, the very purpose of the clause came into play, namely, to protect these endorsers.
O’Quinn should be remanded to complete the accounting of funds received by Whitney in order to determine what balance, if any, is owed to Whitney Bank after considering all permissible credits.
I should also point out that the majority has failed to treat O'Quinn’s argument rela *1200 tive to the Difficiency Judgment Act. Serious questions were raised and are unanswered which could effectively alter the majority’s disposition of this obligation.
APPENDIX
WHITNEY-FARBER LOAN ACCOUNTS PAID TO WHITNEY AS PER KINGSBERRY LESS PAYMENTS RECEIVED AFTER WHITNEY TRIAL (AS PER EXHIBITS) amounts to calculate IMPUTATION
Elk Place Medical Plaza Liability Ledger Card $ 7,179,554.54 $ 60,000.00 18,406.96 $ 7,101,147.58
George A. Farber, M.D. James W. Burks, M.D. 86,500.00 -0-86,500.00
Farlee Company 4,337,337.24 442,522.33 268,098.06 12,114.67 3,614,602.18
George A. Farber, M.D. Guy L. Leefe, Jr. 3,730,813.95 109,000.00 3,621,813.95
Burks Dermatology & Allergy Clinic 120,332.30 -0-120,332.30
Mrs. Alma L. Burks George A. Farber, M.D. 107,000.00 -0-107,000.00
Elk Place Medical Plaza 977,694.64 173,848.70 390,708.79 977,694.64 173,848.70 390,708.79
Farlee Company 504,795.50 504,795.50
George A. Farber, M.D. Guy L. Leefe, Jr. 634,301.19 634,301.19
George A. Farber, M.D. 114,826.62 103,910.44 48.65 10,867.53 -0-
Elk Place Medical Plaza (Foreclosure) 630,225.94 555,541.04 3,821.60 70,438.67 424.63 -0-
George A. Farber, M.D. and Guy L. Leefe, Jr. 438,470.78 -0-438,470.78
Farlee Co. Foreclosures 492,283.45 134,291.84 208,968.52 19.324.17 8,197.09 14,921.31 42.529.17 12.527.17 17,331.52 31,935.80 2,256.86 370,781.62 121,501.83 -0-
$19,918,693.64 $2,147,478.03 $17,771,215.61

. Dr. Farber apparently had an extraordinary entree or working relationship with Whitney Bank personnel, as shown by the voluminous and inordinate loans in this record.

. O’Quinn’s expert, Mike Kingsberry, C.P.A., testified that $19,918,693.64 was received on Farber-related accounts prior to the close of the Whitney trial. I have amended this figure to exclude payments that were in fact received after June 19, 1980, the close of trial in Whitney.

. Calatex Oil & Gas Co. v. Smith, 175 La. 678, 144 So. 243 (1932). Although the parties were bound in solido on the note, the endorsers maintained their status as sureties vis á vis the maker.

. The issue was raised for the first time in the Whitney appeal.

. Case # 12367 dated March 5, 1981

. LSA-C.C. Art. 2163

. See Exhibit P-20

. See the cross-collateral pledge agreement dated September 25, 1978, Farber’s July 11, 1973 letter to Mr. Robert Treuting, vice president of Whitney, and Farber’s testimony on March 6, 1981.

. The first loan, for $428,000, was made on November 15, 1978 and due March 14, 1979. The second was a demand note, executed February 9, 1979 in the amount of $61,500. On February 5 and 6, 1981, payments in the amount of $114,826.62 toward interest and $330,232.47 toward principal were made on these two notes, leaving a balance of $159,-267.53.

. There is no identifying information in the record regarding this block of stocks. Two groups of stock were referred to in Farber’s testimony: one group of stocks that had been “sold,” and another group not yet sold consisting of Fairgrounds and Coldwell Mortgage stock.

. When questioned why he asked Whitney to use this money to pay his personal debts, he stated:
“Why not? I owed all of these debts and that’s what I originally intended it for and I would rather have my own loan paid off than pay for people that may or may not still be friendly or may or may not have some problems, too. It would be stupid for me to say: Pay off somebody else’s first.”

. Whitney again objects stating this issue was litigated in the first suit. The first suit did not determine the issue of collateral behind the note. Also, these sums were received by Whitney on February 5 and 6, 1981, long after the first trial ended.